UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| GERBER FINANCE, INC., | |
|---|---|
| Plaintiff, | 21-cv-507 (JSR) |
| -against- | MEMORANDUM & ORDER |
| VOLUME SNACKS INC., TRACY FREEMAN, and DENISE O'BRIEN, | |
| Defendants. | |

JED S. RAKOFF, U.S.D.J.

Defendant Volume Snacks, doing business as DeRosa Sales ("DeRosa Sales" or "Borrower"), is a family-owned sales and distribution company that supplies convenience stores. DeRosa Sales entered into a lending agreement with Gerber Finance, Inc. ("Gerber"). Defendants Tracy Freeman and Dennis O'Brien, the co-owners of DeRosa Sales, guaranteed the loan. After DeRosa Sales allegedly defaulted on its loan, Gerber sued DeRosa Sales for breach of the loan agreement and sued Freeman and O'Brien for breach of guaranty. Defendants brought counterclaims against Gerber for breach of contract, promissory estoppel, breach of fiduciary duty, and economic duress.

Before the Court is Gerber's motion to dismiss the Amended Counterclaims for failure to state a claim. After careful consideration, the Court hereby grants the motion to dismiss.

1

BACKGROUND

I. Factual Allegations

The following allegations are presumed true for purposes of the motion to dismiss. Tracy Freeman and Denis O'Brien own DeRosa Sales, a "family-owned wholesaler of snack foods and other merchandise to convenience and small grocery stores." Amended Counterclaims ("ACC"), ECF No. 26, at ¶¶ 8-9. DeRosa Sales began to seek financing in 2018 to "stabilize cash flow," "help fund an expected period of growth in the business," and "position the company for a sale that would allow [Freeman and O'Brien] to retire" by 2021. Id. at ¶¶ 9-10, 15.

DeRosa Sales found Gerber Finance, a New York lender, through a broker who pitched several sources of financing to DeRosa Sales. Id. at ¶¶ 4, 11-13. Gerber represented that it was "experienced, flexible, hands-off," and "easier to work with than other lenders." Id. at ¶¶ 13.

During "initial discussions" with Gerber CEO Jennifer Palmer, O'Brien and another officer of DeRosa Sales described their goals for the company. Id. at ¶¶ 17. In those conversations, Palmer allegedly "assured O'Brien and Freeman that the loan facility Gerber proposed would meet the owners' needs" and that the proposed two-year loan "would be renewable on a year-to-year basis" if DeRosa Sales "needed more time beyond the end of the 2021 term." Id. at ¶¶ 17-18.

2

Over several months, Gerber investigated "DeRosa Sales' financial condition, accounts receivable, accounts payable, inventory, and business practices" with the cooperation of DeRosa Sales and the help of an independent auditor. Id. at ¶¶ 19-21. Through the audit, Gerber learned that for decades, "a significant portion of DeRosa Sales' accounts receivable came from its independent distributors, who sell DeRosa Sales' inventory to the stores they serve." Id. at ¶¶ 21-22.

On February 15, 2019, Gerber and DeRosa Sales entered an agreement (the "Loan Agreement") under which DeRosa Sales could borrow against 85% of the value of eligible accounts receivable and 60% of the value of eligible inventory, less any reserves required by Gerber, up to a loan amount of $8.5 million. Id. at ¶¶ 25, 100; Compl., ECF No. 1, Ex. A ("Loan Agreement"), at 2, 14. That same day, DeRosa Sales executed and delivered a promissory note in the amount of $8.5 million dollars. Compl. Ex. B.

Under the Loan Agreement, Gerber could "in its sole discretion, make revolving credit advances" to DeRosa Sales. Loan Agreement § 2.1(a)-(c). The amount DeRosa Sales could borrow depended on its "borrowing base," which was defined as the sum of "Accounts Availability" and "Inventory Availability" minus "Real Estate Availability" and any reserves that Gerber might establish, in its "good faith credit judgment," to protect itself against nonpayment. Id. at 2, 14, § 2.1(a). The Agreement further provided

3

that Gerber would determine which accounts to include in Accounts Availability "in good faith" and "in the reasonable exercise of its discretion." Id. at 5. The Agreement expressly stated that no more than 40% of unpaid accounts from 7-Eleven, or 20% of unpaid accounts from any other vendor, could be included in Accounts Availability. Id. at 5.

By entering the Loan Agreement, DeRosa Sales "acknowledge[d] that the exercise of Lender's discretionary rights hereunder may result . . . in one or more increases or decreases in the advance percentages used in determining Accounts Availability and Inventory Availability." Id. at § 2.1(a)-(c). Gerber could mandate repayment of the loan or impose over-advance fees "at any time that the aggregate outstanding principal balance of the Revolving Credit Advances . . . exce[eds] the Borrowing Base" or § 8.5 million. Id. at § 3.1; 5.1(b)(vi). If DeRosa Sales failed to pay principal, interest, or fees when due; made misleading reports to Gerber; became unable to pay its debts; or "admit[ed] in writing its inability to pay its debts generally," DeRosa Sales would be in default. Id. at § 12.1.

Freeman and O'Brien executed and delivered guaranty agreements under the Loan Agreement. See Compl. ¶¶ 13-14, Ex. C-D; Answer ¶ 6. Under the guaranties, Freeman and O'Brien "unconditionally guarant[eed]" to Gerber "the prompt payment when due (whether by acceleration or otherwise) of all present and

future obligations" that DeRosa Sales owed to Gerber under the Loan Agreement. Compl., Ex C ("Freeman Guaranty"), at 1, Ex. D ("O'Brien Guaranty"), at 1.

Gerber made an initial loan distribution on February 27, 2019 based on a borrowing base of $6.6 million, including about $2 million in accounts receivable tied to independent distributors. ACC ¶ 28-29. A few weeks after the initial distribution, Gerber sought an additional audit. Id. at ¶ 30. Gerber then informed DeRosa Sales in April and May 2019 that it would exclude accounts receivable tied to DeRosa Sales' independent distributors from the borrowing base. Id. at ¶ 31. This lowered the borrowing base by $2 million. Id. Gerber also informed DeRosa Sales that its auditor had found discrepancies in DeRosa Sales' inventory and, even though DeRosa Sales insisted that the auditor had read the relevant spreadsheets incorrectly, Gerber imposed a reserve requirement of $600,000. Id. at ¶¶ 34-35. Gerber also reduced the borrowing base related to 7-Eleven stores, because "there was an overconcentration of revenue coming from one account." Id. at ¶ 36. Because DeRosa Sales had already borrowed against the full initial borrowing base, DeRosa Sales was now over-advanced. Id. at ¶ 33.

DeRosa Sales claims that Gerber's CEO told DeRosa Sales "don't worry, we aren't going to hurt you" and "led Defendants to believe that it was committed to finding a structure and solution to the alleged borrowing-base issue." Id. at ¶ 39.

5

Gerber then presented DeRosa Sales with a default letter in May 2019. Id. at ¶ 44. The letter stated that the over-advance placed DeRosa Sales in default and that Gerber would offer limited advances during a thirty-day interim period while Gerber "propose[d] amendments and modifications to the Loan Agreement to address the alleged over-advance upon receiving . . . financial projections for DeRosa Sales." Id. at ¶ 45.

Gerber refused to advance additional funds to DeRosa Sales unless DeRosa Sales acknowledged default by signing the May 2019 default letter. Id. at ¶ 50. O'Brien explained that DeRosa Sales would have to overdraw its accounts to make payroll and pay vendors without more financing. ACC ¶ 47. O'Brien added that DeRosa Sales' failure to pay vendors, including 7-Eleven, would jeopardize their business relationships. Id. at ¶ 48. O'Brien sought specific information on how Gerber might restructure the loan, but Gerber would not propose any amendments or modifications unless DeRosa Sales acknowledged default. Id. at ¶¶ 49-53. DeRosa Sales signed the default letter, but Gerber did not restructure the loan. Id. at ¶¶ 51-53.

One of DeRosa Sales' customers, Barcel USA, terminated its contract with DeRosa Sales, triggering a buyout clause that would pay DeRosa Sales about $4.3 million. Id. at ¶¶ 57-58. Gerber allegedly promised to restructure the Loan Agreement, "including waiving or crediting back" the over-advance fees, once DeRosa Sales

6

received the Barcel buyout payment in October or November 2019. Id. at ¶ 62. Despite the anticipated influx of cash to DeRosa Sales, Gerber did not restructure the loan or waive the over-advance fees. Id. at ¶¶ 60-63.

In August 2019, Gerber informed DeRosa Sales that it would provide further advances if DeRosa Sales signed the first of three of Forbearance Agreements acknowledging the loan balance and releasing Gerber from all legal claims. Id. at ¶¶ 66-67. O'Brien signed an August 9, 2019 Forbearance Agreement as President of Volume Snacks, and O'Brien and Freeman signed the agreement "individually." Compl., Ex. E, at 2-7.

In September 2019, Gerber's CEO made verbal assurances that Gerber would restructure the loan in light of the Barcel buyout payment. Id. at ¶ 77. DeRosa Sales paid the $4.3 million from the buyout directly to Gerber, bringing its loan balance down to approximately $1.5 million. Id. at ¶ 80. However, Gerber continued to change the calculation of the borrowing base. Id. at ¶ 81-84.

In December 2019, O'Brien "explained to Gerber" that DeRosa Sales was "without necessary funds to conduct business." See id. at ¶¶ 89-90. DeRosa Sales executed a second forbearance agreement on January 3, 2020. Compl., Ex. F. Without further advances from Gerber, DeRosa Sales faced "dire economic circumstances" and "had no choice" but to execute a third forbearance agreement less than three weeks later, on January 23, 2020. Id. at ¶ 90-91.

7

Under each forbearance agreement, DeRosa Sales agreed to:

> "absolutely, unconditionally, and irrevocably release[] . . . Lender . . . from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever, . . . known or unknown, suspected or unsuspected, both at law and in equity, . . . including [claims], without limitation, for or on account of, or in relation to, or in any way in connection with any of the Loan Agreement."

Compl., Ex. E at 4; Ex. F at 3; Ex. G at 3.

## II. Procedural History

On January 20, 2021, Gerber Finance, Inc. sued DeRosa Sales, Tracey Freeman, and Denise O'Brien, alleging that DeRosa Sales breached the loan agreement and that Freeman and O'Brien breached the guaranty. Compl., ECF No. 1. The Complaint alleges that Gerber agreed to make a loan, guaranteed by Freeman and O'Brien, of not more than $8.5 million to DeRosa Sales. Id. at ¶¶ 11, 15. After DeRosa Sales defaulted on its obligations, Gerber liquidated DeRosa Sales, leaving an unpaid sum of around $1.3 million. Id. at ¶ 29. Defendants have allegedly refused to pay the remaining balance. Id. at ¶ 30. On April 5, 2021, defendants filed an amended answer and counterclaims for breach of contract, promissory estoppel, breach of fiduciary duty, and economic duress. ECF No. 26. Gerber now moves to dismiss those counterclaims.

8

## LEGAL STANDARD

A motion to dismiss a counterclaim pursuant to 12(b)(6) is evaluated under the familiar Twombly and Iqbal standard. GEOMC Co., Ltd. v. Calmare Therapeutics Inc., 918 F.3d 92, 99 (2d Cir. 2019). The court accepts the counterclaimant's "factual allegations as true and draws all reasonable inferences in [the counterclaimant's] favor." Giunta v. Dingman, 893 F.3d 73, 78-79 (2d Cir. 2018). Conclusory allegations and "[t]hreadbare recitals of the elements of a cause of action" are not entitled to the presumption of truth. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Setting aside legal conclusions couched as fact, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc., 847 F.3d 92, 94 (2d Cir. 2017) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim for relief is facially plausible when the plaintiff goes beyond facts that are "merely consistent with" liability and "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

In evaluating the motion to dismiss, the Court also considers the Loan Agreement, the Forbearance Agreements, and the Guaranty Agreements, because these documents are integral to the

9

counterclaims. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002).

DISCUSSION

I. DeRosa Sales Waived Its Counterclaims

A party alleging that it has been released from the claims against it by a written agreement "has a presumption in his favor that there have been no irregularities in its execution," and this presumption "establish[es] a prima facie case [of nonliability] if the party can also prove the authenticity of the signature on the document." Fleming v. Ponziani, 247 N.E.2d 114, 118-19 (N.Y. 1969). Defendants admit that the signatures on the Forbearance Agreements are authentic. Answer ¶ 7, 9. Thus, the burden shifts to defendants "to show that there has been fraud, duress or some other fact which will be sufficient to void the release." Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V., 952 N.E.2d 995, 1000 (N.Y. 2011) (quoting Fleming, 247 N.E.2d at 118). Defendants argue that the Forbearance Agreements are unenforceable for lack of consideration and because the agreements were procured by economic duress.[1] Neither argument has merit.

---

[1] Defendants also argue that O'Brien and Freeman are not bound by the forbearance agreements, because the agreements release only the claims that Borrower has against the Lender. The Court need not address these arguments because, as discussed below, the guaranty agreements into which O'Brien and Freeman entered independently preclude their counterclaims.

10

First, under New York law, a written release of claims cannot be invalidated for lack of consideration. N.Y. Gen. Oblig. § 15-503; see also VKK Corp. v. Natl. Football League, 244 F.3d 114, 127 (2d Cir. 2001). Further, the agreements are supported by consideration. DeRosa Sales agreed to release its legal claims in exchange for Gerber's agreement not to exercise certain options to cure default, such as calling the $8.5 million promissory note due. See Compl., Ex. E at 4; Ex. F at 3; Ex. G at 3.

Second, economic duress can be established only under "extreme and extraordinary" circumstances not found here. See VKK Corp. v. Nat'l Football League, 244 F.3d 114, 123 (2d Cir. 2001). To void a release agreement between sophisticated parties on economic duress grounds, the plaintiff must "do more than merely claim that the other party knew about and used his or her poor financial condition to obtain an advantage in contract negotiations." DuFort v. Aetna Life Ins., 818 F. Supp. 578, 581 (S.D.N.Y. 1993). Instead, the complaining party must show he "was compelled to agree to [the agreement] terms by means of a wrongful threat which precluded the exercise of his free will." Davis & Assocs., Inc. v. Health Mgmt. Servs., Inc., 168 F. Supp. 2d 109, 114 (S.D.N.Y. 2001) (quoting Worth Constr. Co. v. I.T.R.I. Masonry Corp., 2001 WL 209924, at *5 (S.D.N.Y. Feb. 21, 2001)). "[U]nder New York law, threats to enforce a party's legal rights do not

constitute duress." DiRose v. PK Mgmt. Grp., 691 F.2d 628, 633 (2d Cir. 1982).

Borrower alleges that it was under duress because Gerber unreasonably recalculated DeRosa Sales' borrowing base after DeRosa Sales had already borrowed against the initial higher amount. See ACC ¶¶ 31-35. Gerber "eliminated from the borrowing base the accounts receivable from DeRosa Sales' independent distributors," "limited the percentage of 7-Eleven accounts DeRosa Sales could borrow against," and required a reserve amount of $600,000. Id. at ¶¶ 31, 34. Because DeRosa Sales had already borrowed against the full amount of the initial higher borrowing base, DeRosa Sales was suddenly over-advanced by $2 million. See id. at ¶¶ 33, 41. When DeRosa Sales sought funding beyond the amount corresponding to the recalculated Borrowing Base, Gerber refused to provide further funds under the Loan Agreement. Id. at ¶ 65.

The Loan and Security Agreement uses the term "Borrowing Base" to refer to the sum of "Accounts Availability[] plus Inventory Availability[,] minus Real Estate Availability [and] the Reserves." Loan Agreement at 2. Under the agreement terms, Gerber "may, in its sole discretion, make revolving credit advances" to DeRosa Sales, and DeRosa Sales "acknowledge[d] that the exercise of Lender's discretionary rights hereunder may result . . . in one or more increases or decreases in the advance percentages used in

12

determining Accounts Availability and Inventory Availability." Loan & Security Agreement § 2.1(a)-(c). Thus, Gerber was entitled under the Loan Agreement to unilaterally change the calculation of DeRosa Sales' borrowing base.

Further, because Gerber could make credit advances "in its sole discretion," Gerber could decline to lend any funds at all. When a contract provision that gives a lender sole and absolute discretion over whether and how much it will lend, the lender does not make a "wrongful threat" by refusing to provide additional advances. Interpharm, Inc. v. Wells Fargo Bank, N.A., 2010 WL 1257300, at *1 (S.D.N.Y. Mar. 31, 2010), aff'd sub nom. Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n, 655 F.3d 136 (2d Cir. 2011), is instructive. In Interpharm, a borrower entered a loan agreement that involved a borrowing base defined by the lender in its reasonable discretion. Id. at *1. The borrower defaulted on the loan agreement during financial straits, and then entered into a series of increasingly strict forbearance agreements. Id. at *9. The district court found Wells Fargo did not make a "wrongful threat" when, before the parties executed the forbearance agreements, Wells Fargo reduced Interpharm's borrowing base by excluding certain accounts from eligibility, "vaguely propos[ed] to negotiate new financial covenants," treated Interpharm's admission that it would not meet income targets as a default, and refused to make further loans although Interpharm could no longer

pay its suppliers or make payroll. Id. at *1-3. Similarly here, Gerber did not make a wrongful threat by exercising—albeit unforgivingly—its contractual options.

Defendants rely on Austin Instrument, Inc. v. Loral Corp., 272 N.E.2d 533 (N.Y. 1971), to support its argument that the prospect of going out of business can preclude free will and amount to economic duress. See Def. Opp. 20. In that case, Austin Instrument, Inc. ("Austin") threatened not to supply a key part that Loral Corporation ("Loral") needed to fulfill a government contract unless Austin agreed to higher prices. Austin, 272 N.E.2d at 253 at 534. If Austin could not timely deliver the parts to the Navy, Austin would face hefty liquidated damages and risk the loss of an important business relationship with the government. Id. at 536. Although threatened breach of contract "does not itself constitute economic duress," because Loral could not obtain the parts from another source or succeed in a breach of contract action before the delivery was due, the Court of Appeals held that the price-increase agreement was void for duress. Id.

The Austin Court focused on the lack of alternatives available to the complaining party, and this Court must as well. Subsequent courts have distinguished Austin when a borrower could have sued the lender for breach or declared voluntary bankruptcy. See, e.g., Davis & Assocs., 168 F. Supp. 2d at 117 n.3 (available option to sue for breach); Nelson v. Stanley Blacker, Inc., 713 F. Supp.

14

107, 110 (S.D.N.Y. 1989) (same); Interpharm, 2010 WL 1257 300, at *11 (bankruptcy). Defendants do not plead that they even considered these alternatives, let alone that these options were not available. The Court therefore rejects Defendants' argument that they had no choice but to sign the forbearance agreements.

Even accepting that DeRosa Sales and the Guarantors were under duress, a contract procured by duress is voidable, not void. United States v. Twenty Miljam-350 IED Jammers, 669 F.3d 78, 89 (2d Cir. 2011). One claiming duress "must act promptly" once the source of duress is removed to repudiate the contract "or will be deemed to have elected to affirm it." Scientific Holding Co. v. Plessey Inc., 510 F.2d 15, 23 (2d Cir. 1974); see also Nicomedez v. AIG, 2012 WL 5264560, at *4 (S.D.N.Y. Oct. 16, 2012). When a plaintiff waits over a year to void a contract on duress grounds, the delay is unreasonable under New York law. See, e.g., Legal Aid Soc'y v. New York, 114 F.Supp.2d 204, 225-6 (S.D.N.Y. 2000) (twenty-month delay was unreasonable); Joseph F. Egan, Inc. v. New York, 215 N.E.2d 490, 493 (N.Y. 1966) (two-year delay was unreasonable); Bank Leumi Trust Co. v. D'Evori Int'l, Inc., 558 N.Y.S.2d 909, 914 (N.Y. Ct. App. 1990) (six-month delay was unreasonable). The last Forbearance Agreement was signed fifteen months before Defendants brought these Counterclaims, giving Defendants plenty of time to repudiate the contract in the interim. Defendant chose not to do so. Under New York law, even a six-month delay has been held to

foreclose an economic duress claim. Defendants cannot do so now after over a year.

## II. Guarantors Waived Their Counterclaims

The Guarantors have also waived their counterclaims. O'Brien and Freeman executed guaranty agreements under which their liability for the loan amount was "absolute and unconditional" and would "remain in full force and effect without regard to" any circumstance that might "constitute a defense available to, or a discharge of the undersigned." Freeman Guaranty at ¶ 2; O'Brien Guaranty at ¶ 2. The guaranty agreements further provide that, as guarantors, O'Brien and Freeman "waive[] . . . any rights to interpose any defense, counterclaim or offset of any nature and description which the [guarantor] may have or which may exist between and among Lender, Borrower and/or the [Guarantor] with respect to the undersigned's obligations under this Guaranty." Freeman Guaranty at ¶ 3; O'Brien Guaranty at ¶ 3.

It is well settled that "[w]here a guaranty states that it is 'absolute and unconditional,' guarantors are generally precluded from raising any affirmative defense." HSH Nordbank Ag New York Branch v. Swerdlow, 672 F.Supp.2d 409, 418 (S.D.N.Y. 2009). Further, unless a contractual provision would bar a counterclaim sounding in fraud, contracts that waive the right to assert counterclaims are enforceable under New York law. See Fed. Deposit Ins. Corp. v. Frank L. Marino Corp., 425 N.Y.S.2d 34, 35-36 (2d

16

Dep't 1980); see also Midatlantic Nat'l Bank/North v. Serv. Res. Indus. Inc., 1991 WL 177281, at *3 (S.D.N.Y. 1991).

The guarantors argue that notwithstanding this broad and unconditional release, the guarantors may bring a claim alleging "that the creditor's wrongful post-execution conduct triggered the event that accelerates or causes the guarantor's liability." See Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A., NY. Branch v. Navarro, 36 N.E.3d 80, 87 (N.Y. 2015) (citing Canterbury Realty & Equip. Corp. v. Poughkeepsie Sav. Bank, 524 N.Y.S.2d 531 (1988)). But as discussed above, counterclaimants have not sufficiently alleged that Gerber's post-execution conduct was wrongful.

Because Defendants waived the counterclaims they now bring, the Court need not reach whether the breach of contract, breach of fiduciary duties, promissory estoppel, and independent economic duress allegations state a claim.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the motion to dismiss.

SO ORDERED.

Dated:  New York, NY
        July 19, 2021

JED S. RAKOFF, U.S.D.J.